IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,900






TOMAS RAUL GALLO, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 940093 IN THE 182ND DISTRICT COURT

HARRIS COUNTY





 

 MEYERS, J., delivered the opinion of the Court, in which Keller, P.J., and
Price, Johnson, Keasler, Hervey, Holcomb, and Cochran, JJ., joined. Womack,
J., concurred.


O P I N I O N



 Appellant was convicted in February 2004, of the capital murder of an individual
under six years of age. Tex. Penal Code § 19.03(a)(8). (1) Based on the jury's answers to
the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections
2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g). (2) Direct
appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's thirteen
points of error, we find them to be without merit. Consequently, we affirm the trial court's
judgment and sentence of death.

ADMISSION OF PHOTOGRAPHS


 In his fifth point of error, appellant claims that the trial court erred in admitting
"numerous, repetitious, [and] gruesome" photographs of the dead three-year-old victim in
violation of the Eighth and Fourteenth Amendments to the United States Constitution. He
complains that "[t]he photographs of the deceased child are hideous" and their admission
"created a very serious risk that the jury would be unable to put aside their natural
emotional repulsion and disgust and make their guilt and/or sentencing decision in a
rational manner." He asserts that the photographs were unfairly prejudicial, especially in
light of the fact that "[t]here was ample other evidence to illustrate the facts in the instant
case[,]" such as the medical examiner's report, which gave a very detailed description of the
child's body. Without addressing the individual photographs, appellant generally complains
about the admission of State's Exhibits 66-68, 70-79, 81-100, and 118-120.

 The admissibility of a photograph is within the sound discretion of the trial judge. 
Williams v. State, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Generally, a photograph 
is admissible if verbal testimony as to matters depicted in the photographs is also
admissible. Id.; Long v. State, 823 S.W.2d 259, 271-72 (Tex. Crim. App. 1991). In other
words, if verbal testimony is relevant, photographs of the same are also relevant. Texas
Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make
the existence of any fact that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence." A visual image of the
injuries appellant inflicted on the victim is evidence that is relevant to the jury's
determination. The fact that the jury also heard testimony regarding the injuries depicted
does not reduce the relevance of the visual depiction. 

 Rule 403, on the other hand, allows for the exclusion of otherwise relevant evidence
when its probative value "is substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence." Rule 403 favors the admission of relevant
evidence and carries a presumption that relevant evidence will be more probative than
prejudicial. Williams, 958 S.W.2d at 196. A court may consider several factors in
determining whether the probative value of photographs is substantially outweighed by the
danger of unfair prejudice. These factors include, but are not limited to: the number of
exhibits offered, their gruesomeness, their detail, their size, whether they are black and
white or color, whether they are close-up, and whether the body depicted is naked or
clothed. Id. The availability of other means of proof and the circumstances unique to each
individual case must also be considered. Id. 

 Appellant filed a pre-trial "Motion to Suppress Gruesome Photographs." At the
beginning of the motion, appellant generally and globally moved the trial court "to exclude
all gruesome photographs of the victim." In the body of the motion, appellant generally set
out the rule of relevance and the balancing test of Rule 403. However, in arguing that these
rules should be applied to exclude the photographs in the instant case, appellant specifically
referred only to the "[m]edical [e]xaminer's photographs." 

 State's Exhibits 118, 119, and 120 are all photographs of the victim as she appeared
at the hospital. When the State offered these photographs into evidence, appellant stated,
"No objections other than previously lodged[,]" apparently referring to the pre-trial motion
to suppress that was filed. "Being no objection," the court admitted the photographs. 
Because appellant's pre-trial motion only specifically referred to the medical examiner's
photographs, appellant's reference to "objections . . . previously lodged" was not
sufficiently specific to preserve any error regarding these three exhibits. See Tex. R. App.
P. 33.1. Notwithstanding this, we note that all three photographs show no more than the
injuries that the victim suffered shortly before her death at a time when appellant was the
only adult with her. See Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). 
The trial court did not abuse its discretion in admitting these photographs.

 The remaining complained-of photographs were all taken during the medical
examiner's investigation. State's Exhibits 66-68, 70-79, and 81-90 were identified by
Chief Medical Examiner Dr. Luis Sanchez, who testified that he had reviewed 290
photographs and 61 glass slides before selecting these twenty-three photographs to
illustrate the results of the external examination of the body and the external injuries the
victim suffered shortly before her death. All twenty-three of the color photographs are
3½" x 5" in size and show the unclothed victim lying on the medical examiner's table. The
photographs were taken from different angles and show various views of the over 200
contusions and lacerations the victim suffered in the last hours of her life. The photographs
are no more gruesome than would be expected in this sort of crime. See Narvaiz, 840
S.W.2d at 429. 

 State's Exhibits 91-99 are also 3½" x 5" color photographs and are more gruesome
than the other photographs because they all show injuries discovered during the internal
examination of the victim's body. Specifically, State's Exhibits 91 and 92 show close-up
views of the cracked ribs the victim suffered shortly before her death. In Exhibit 91, the rib
has been removed from the body. State's Exhibits 93-99 show various views of the
underside of the victim's scalp, the victim's skull, and one picture of the victim's brain. 
The medical examiner used the photographs to show the massive amount of damage that
was inflicted on the victim before her death, including a twelve-inch fracture that began at
the base of her skull where the bone is thick. More specifically, the witness used the
photographs to show the injuries that could not be seen on the surface of the body.

 Although these photographs are gruesome, there was no danger that the jury would
attribute the removal of the rib, scalp, or skull cap to the defendant. Further, the
photographs were highly probative to show the full extent of the injuries appellant inflicted
on the victim. See Salazar v. State, 38 S.W.3d 141, 147-53 (Tex. Crim. App. 2001). 
Under the circumstances of this case, we cannot say that the trial court abused its
discretion in deciding that the probative value of the photographs substantially outweighed
the danger of unfair prejudice. See id.

 Finally, appellant complains that State's Exhibit 100 was more prejudicial than
probative. State's Exhibit 100 is an 8½" x 11" piece of paper with a reproduction of State's
Exhibit 79, a photograph showing damage to the victim's vagina, in a slightly larger
format-that is, the original 3½" x 5" color picture has been reproduced as a 6¼" x 6¾"
color image. That image is also somewhat overlapped by a 5¾" x 4" color picture depicting
how a healthy child's intact vagina should appear. When this exhibit was introduced, State's
Exhibit 79 had already been admitted into evidence. Further, this exhibit helped the jury to
understand the extent of the injuries that the victim suffered shortly before her death. 
Although the vaginal injuries were not the direct cause of death, the evidence suggested that
appellant inflicted them during the same continuous transaction that resulted in her death. 
See Rojas v. State, 986 S.W.2d 241, 249-50 (Tex. Crim. App. 1998) (autopsy photos of
capital-murder victim showing injuries to her pelvic area, although not the cause of death,
were "probative of appellant's mental state at the time of the murder, the specific
circumstances of the murder, and the fact that appellant omitted some information from his
statements to the police"). Evidence of the additional injuries was probative of appellant's
mental state at the time of the murder and the specific circumstances of the murder. See
id. Appellant has not shown that the prejudicial impact of this exhibit substantially
outweighed its probative value. Because the trial court did not abuse its discretion in
admitting any of the challenged photographs, point of error five is overruled.

MOTION FOR CONTINUANCE

 In point of error six, appellant argues that the trial court erroneously denied his
motion for a continuance regarding the State's "surprise witness," Thomas Michael
Gilstrap, who testified about statements appellant made to him while they were inmates at
the Harris County Jail. Appellant asserts that he was denied effective assistance of counsel
and due process because he was unable to properly investigate and cross-examine Gilstrap. 

 We review a trial court's ruling on a motion for continuance for abuse of discretion.
 Janecka v. State, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996). To establish an abuse of
discretion, there must be a showing that the defendant was actually prejudiced by the denial
of his motion. Id. A bare assertion that counsel did not have adequate time to interview the
State's potential witness does not alone establish prejudice. Heiselbetz v. State, 906
S.W.2d 500, 512 (Tex. Crim. App. 1995). 

 Gilstrap contacted the prosecutor on Thursday, February 5, 2004, a few days after
the commencement of the State's case-in-chief. That same day, the prosecutor informed
defense counsel that he intended to call Gilstrap as a witness. Defense counsel filed a
motion for continuance on February 9, requesting more time to investigate Gilstrap's
criminal and mental-health history. During a bench conference on the motion, the
prosecutor stated Gilstrap called him on February 5, after Gilstrap saw defense counsel "on
TV trying to blame the [victim's] mother." The prosecutor further stated that he was
unaware of Gilstrap's existence prior to that time, that he immediately informed defense
counsel about Gilstrap and the information he possessed, and that he provided defense
counsel with Gilstrap's criminal history and jail records. Gilstrap testified in a hearing
outside the presence of the jury that appellant admitted killing the victim and said he would
"beat the case" because he failed an IQ test and was mentally retarded. Gilstrap also
disclosed his own prior convictions and testified that he was currently on parole, had a prior
parole violation for assaulting his wife, had a prior heroin problem, and had been sent to
"M.H.M.R." while in jail because he was depressed. At the close of the hearing, the trial
court overruled defense counsel's objection and decided "to allow the testimony." (3)

 Gilstrap testified before the jury that he contacted the District Attorney's Office
after he saw media coverage of appellant's case on television. He acknowledged his prior
convictions, parole status, substance-abuse problems, and the fact that he was depressed
while in jail. He testified that appellant talked to him about the instant offense when they
were housed in the Harris County Jail in January 2003. He testified that appellant stated,
"I'm the one that killed that little girl." Appellant told Gilstrap that he was watching his
girlfriend's daughter while she was at work, that the child was "bothering" him and "making
a lot of noise," that he "spanked her four or five times," that she "quit breathing" after he
"slammed her into the bathtub," and that he "got real scared," "tried to clean her up," and
"called her mother at work." He also told Gilstrap that "he failed the IQ test" and "he'd
probably beat the case because he was retarded." 

 Defense counsel cross-examined Gilstrap about the details of his assault on his
wife, his "26 years of heroin abuse," the medications he was taking in the jail "psych ward,"
his cocaine abuse, his thirty-year criminal history, and the fact that he waited so long to
come forward with information pertaining to appellant. Given trial counsel's extensive
cross-examination, appellant has failed to show what surprise remained or in what manner
counsel could have been more effective if he had been given more time to prepare for this
witness. He has failed to show that he was actually prejudiced by the trial court's ruling. 
Point of error six is overruled.


EXPERT WITNESS

 In point of error seven, appellant asserts that the trial court erroneously excluded the
expert testimony of Dr. George Holden "regarding the issue of filicide." He alleges that
the trial court's ruling denied him a meaningful opportunity to present a complete defense. 

 Rule 702 of the Texas Rules of Evidence provides: "If scientific, technical, or other
specialized knowledge will assist the trier of fact to understand the evidence or to
determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,
training, or education may testify thereto in the form of an opinion or otherwise." TEX. R.
EVID. 702. The proponent of scientific evidence must show, by clear and convincing
proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately
understanding other evidence or in determining a fact in issue. Nenno v. State, 970 S.W.2d
549, 560-561 (Tex. Crim. App. 1998), overruled on other grounds by State v. Terrazas,
4 S.W.3d 720, 727 (Tex. Crim. App. 1999). The reliability of "soft" science evidence may
be established by showing that: (1) the field of expertise involved is a legitimate one; (2)
the subject matter of the expert's testimony is within the scope of that field; and, (3) the
expert's testimony properly relies upon or utilizes the principles involved in that field. (4) 
Nenno, 970 S.W.2d at 561. A trial court's ruling on the admissibility of the scientific
expert testimony is reviewed under an abuse of discretion standard. Weatherred v. State,
15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

 The trial court held a hearing outside the presence of the jury on the admissibility of
Holden's testimony. Holden testified that he was a college professor with a Ph.D. in
developmental psychology and that he had "research expertise in the area of parent/child
relationships and family violence." He explained that "filicide" is "what researchers call
the phenomenon of parents that kill their children." He testified that "mothers are
[statistically] more likely to kill their children than fathers" and that there are many
"different motives or causes behind why parents may kill their children," including "when
discipline goes ary [sic]." The trial court then asked defense counsel to clarify the
proposed expert testimony:

 THE COURT: Can you tell me again what, I mean, just like maybe a
couple of lines, sentences on what the focus of the testimony is suppose[d]
to be in front of the jury[?]


 [DEFENSE COUNSEL #1]: The risk factors, which is where he's
going now.


 THE COURT: Whose risk factor?


 [DEFENSE COUNSEL #1]: The general risk factors in filicides and
then the risk factors of [the victim's mother] Cristina Arredondo.


 THE COURT: That puts the child at risk?


 [DEFENSE COUNSEL#1]: Her risk, what makes her a risk and
potential suspect for the perpetration of the homicide.


 [DEFENSE COUNSEL #2]: As far as a profile goes, Judge, a profile
for someone.


 [DEFENSE COUNSEL #1]: Risk factors.


 THE COURT: Thank you, that's what I was looking for. 

 

 You are wanting to set up a profile for somebody that kills their own
child?

 [DEFENSE COUNSEL #1]: Yes, ma'am.


Holden then explained that he reviewed Arredondo's "psychological report" and "C.P.S.
records" and concluded that she had the following "risk factors that are certainly associated
with physical child abuse": youth; limited income and education; the stress of having two
young children; "personality attributes identified as antisocial and narcissistic, angry and
capable of manipulative behavior"; "rigid child rearing attitudes" with the use of physical
punishment; "evidence that [the victim] was a difficult, challenging child"; "a series of
relationship problems with adult men"; and, being a victim of both physical and
psychological domestic violence herself. 

 On cross-examination, Holden testified that "[t]he science of predicting one who is
capable of killing is inexact" and "there hasn't been extensive enough research into the
characteristics of filicide in order to come up with a set profile." At the conclusion of the
hearing, the trial court ruled Holden's testimony inadmissible:

 THE COURT: I am not going to allow that testimony, in fact, for a
couple of different reasons. 


 No. 1, I think, sort of the last sentence out of the witness' mouth sort
of sealed it, not extensive enough research for him to give any kind of risk
factors as to the study of filicide, which the Court has questions as to
whether that's a legitimate field of expertise and whether it would be helpful
to the jury or not, so I am going to - - I am not going to allow that testimony.


 * * *


 I don't find his testimony with regard to the studies of filicide or child
abuse to be reliable[.]

 Appellant did not show by clear and convincing proof that Holden's testimony was
sufficiently relevant and reliable to assist the jury in accurately understanding other
evidence or determining a fact in issue. The trial court did not abuse its discretion in ruling
the evidence inadmissible. The trial court's ruling did not prevent appellant from arguing
that the victim's mother could have committed the crime. Point of error seven is
overruled. 

JURY ARGUMENT

 In his eighth point of error, appellant contends that the State "purposefully attacked
appellant over the shoulders of defense counsel" during its closing argument at the guilt
phase of the trial. Permissible jury argument falls into one of four areas: (1) summation
of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument
of opposing counsel; or (4) a plea for law enforcement. Cannady v. State, 11 S.W.3d 205,
213 (Tex. Crim. App. 2000). We have consistently held that argument that strikes at a
defendant over the shoulders of defense counsel is improper. Wilson v. State, 7 S.W.3d
136, 147 (Tex. Crim. App. 1999); Dinkins v. State, 894 S.W.2d 330, 357 (Tex. Crim. App.
1995). 

 Appellant complains about the following portion of the prosecutor's closing
argument:

 [PROSECUTOR]: This focus on Cristina and the 911 calls, I haven't
got a clue what [defense counsel's] clue is about on that one. I mean, come
on, the 911 numbers, a hang-up call, what does that tell you? He had a
hypothesis like he does most of the time with Mr. Sanchez - - Dr. Sanchez,
that the 911 calls are land lines over here while the 20-minute gap is over
here (indicating). Where in the hell is the evidence on that? There isn't any. 
It's his theory to run you down a rabbit trail so you'll lose focus of Tomas
Gallo.

 

 [DEFENSE COUNSEL]: We object to the prosecutor striking the
defendant over counsel's shoulder.


 THE COURT: Sustained.


 [DEFENSE COUNSEL]: Ask the jury be instructed to disregard.


 THE COURT: Please disregard the last comment.


 [DEFENSE COUNSEL]: We respectfully move for a mistrial.

 

 THE COURT: Overruled.


 Assuming, as the trial court did, that the prosecutor's comment was inappropriate,
we next turn to the question of harm. We conduct a harm analysis using the following
three-factor test: (1) the severity of the misconduct (the magnitude of the prejudicial
effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the
efficacy of any cautionary instruction by the judge); and, (3) the certainty of conviction
absent the misconduct (the strength of the evidence supporting the conviction). Mosley v.
State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

 In this case, curative action was taken because the trial judge instructed the jury to
disregard the prosecutor's comments. The third factor also weighs in favor of the State due
to the strength of its evidence, including appellant's own admissions and DNA evidence
connecting him to the offense. Appellant was not harmed by the prosecutor's argument. 

 Appellant also argues that the trial court improperly denied his motion for a mistrial
when the prosecutor used curse words twice during closing argument: [PROSECUTOR]: . . . Alexis didn't name anybody else as being
present in that home when her sister was murdered, not a one. The only one
mentioned was Tomas Gallo, the only name given.


 It doesn't take a rocket scientist at that point to figure out who your
suspect is, and it kind of helps when you've got an idea who you are looking
for and the son-of-a-bitch is running - - 


 [DEFENSE COUNSEL]: Objection, Your Honor.


 THE COURT: Sustained.


 [DEFENSE COUNSEL]: We ask for an instruction to disregard.


 THE COURT: The jury will be instructed to disregard the last
comment.


 [DEFENSE COUNSEL]: And we respectfully ask for a mistrial.


 THE COURT: Overruled.


 [PROSECUTOR]: When he's the one running, hiding in a car two
streets over and he's smoking marijuana and he's eating pizza . . .


 * * *


 [PROSECUTOR]: . . . That baby was laying there, like he says, it was
for that 20 minutes worth of phone calls. How did - - why didn't he dial 911? 
Why didn't he dial 911? He didn't dial 911 because he is the killer. He's
thinking, oh, shit, what have I done? What am I going to do now?


 [DEFENSE COUNSEL]: I object again - - 


 THE COURT: Sustained.


 [DEFENSE COUNSEL]: I ask the jury be instructed to disregard.

 

 THE COURT: [Prosecutor], please refrain - - please use proper
language.


 [PROSECUTOR]: Yes, ma'am.

 

 [DEFENSE COUNSEL]: We ask that a mistrial be granted.


 THE COURT: Overruled.

 Appellant's argument on appeal is that the prosecutor "subjected [him] to epitaphs
unworthy of courtroom decorum and in violation of the United States Constitution." His
general objection at trial does not comport with his argument on appeal. Further, he fails to
explain on appeal exactly which of his federal constitutional rights were violated. This
portion of his argument is not preserved and is inadequately briefed. Tex. R. App. P. 33.1
and 38.1. Point of error eight is overruled. 

VOLUNTARINESS INSTRUCTION

 In point of error four, appellant asserts that the trial court erroneously denied his
requested instruction on the voluntariness of his statement:

 You are instructed that no evidence obtained by an officer or other
person in violation of any provisions of the Constitution or laws of the State
of Texas or the Constitution or laws of the United States of America, shall be
admitted in evidence against the accused on trial of any criminal case.


 You are instructed that the Constitution and laws of the State of Texas
and of the United States provide that no written statement of an accused,
made as a result of custodial interrogation, shall be admitted against him at a
criminal trial unless the officer or person taking the statement has, prior to
taking the statement, informed the suspect of his right to remain silent,
including his right to terminate his participation even if he has begun to make
a statement, and his right to counsel before and during the making of a
statement, including his right to appointed counsel for the purpose of
advising him at the time.


 You are further instructed that the Constitution and the laws of Texas
and the United States provide that if, after a person has received warnings of
his constitutional rights and interrogation continues and a statement is
obtained in the absence of an attorney, the State bears a heavy burden to prove
that the defendant knowingly and intelligently waived his privilege against
self incrimination and his right to appointed counsel.


 You are instructed that Texas statutory law requires that a written
statement may not be used against a defendant unless the face of the
statement reflects that the accused, prior to and during the making of the
statement, knowingly, intelligently and voluntarily waived the right to remain
silent and the right to counsel.


 Therefore, if you find or believe that Defendant's mental retardation
or mental impairment prevented him from making an understanding waiver of
his right to remain silent or his right to counsel, you will find that the
statement was taken in violation of the Constitution or laws of Texas and/or
the United States, and you will not consider the statement for any purpose
against him.


Appellant specifically complains that the trial court should have instructed the jury to
disregard his statement if they determined that his "mental retardation or impairment was
such that he could not understand the Miranda[ (5)] warnings." He claims he was deprived of
his constitutional right to a fair trial as a result of the trial court's error.

 The trial court instructed the jury in compliance with Articles 38.21, 38.22, and
38.23. It would have been improper for the trial court to include the issue of mental
retardation in its voluntariness instruction. Penry v. State, 903 S.W.2d 715, 748 (Tex.
Crim. App. 1995). An instruction that focuses on a particular factor that may render a
statement involuntary is an impermissible comment on the weight of the evidence. Id.;
Rocha v. State, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000). Point of error four is overruled.

MENTAL RETARDATION

 Appellant's first three points of error pertain to the issue of mental retardation. In
Atkins v. Virginia, 536 U.S. 304 (2002), the United States Supreme Court held that it is
unconstitutional to execute one who is mentally retarded. The Court left to the individual
states the job of establishing the substantive and procedural mechanisms to implement that
holding. Id. In the three legislative sessions since Atkins, the Texas Legislature has not
established a statutory scheme for the presentation and determination of an issue of mental
retardation in a capital murder trial. In the absence of legislative action, this Court has
formulated temporary judicial guidelines in addressing Atkins claims. Ex parte Briseno,
135 S.W.3d 1, 5 (Tex. Crim. App. 2004). We define mental retardation as a disability
characterized by: (1) "significantly subaverage" general intellectual functioning; (2)
accompanied by "related" limitations in adaptive functioning; (3) the onset of which occurs
prior to the age of 18. Id. at 7. Other evidentiary factors that factfinders in the criminal-trial context might also focus on in weighing evidence as indicative of mental retardation
include:

Did those who knew the person best during the developmental stage-his
family, friends, teachers, employers, authorities-think he was mentally
retarded at that time, and, if so, act in accordance with that determination?


Has the person formulated plans and carried them through or is his conduct
impulsive?


Does his conduct show leadership or does it show that he is led around by
others?


Is his conduct in response to external stimuli rational and appropriate,
regardless of whether it is socially acceptable?


Does he respond coherently, rationally, and on point to oral or written
questions or do his responses wander from subject to subject?


Can the person hide facts or lie effectively in his own or others' interests?


Putting aside any heinousness or gruesomeness surrounding the capital 

offense, did the commission of that offense require forethought, planning,
and complex execution of purpose?


Id. at 8-9. Although a jury determined the issue of mental retardation in this case, it is
important to note at the outset that a jury determination of mental retardation is not
required. See Schriro v. Smith, 546 U.S. 6, 7 (2005)(holding that the Ninth Circuit erred
in commanding Arizona courts to conduct a jury trial to resolve mental-retardation claim);
see also Briseno, 135 S.W.3d at 9 (holding that Atkins does not require a jury
determination of mental retardation in a post-conviction proceeding). With this overview,
we now turn to appellant's points of error. 

 In his first point of error, appellant claims that the evidence is both legally and
factually insufficient to support the jury's determination that he is not mentally retarded. (6) 
The question of whether appellant was mentally retarded was submitted to the jury as
"Special Issue No. 2" in the punishment charge: "Do you find, taking into consideration all
of the evidence, that the Defendant is a person with mental retardation?" The jury
unanimously answered this special issue in the negative.

 This Court held in Briseno that the mental retardation issue is like the affirmative
defenses of insanity, incompetency to stand trial, and incompetency to be executed. 135
S.W.3d at 12. Thus, in a habeas action, a defendant has the burden to prove mental
retardation by a preponderance of the evidence. Id. Similarly, we now hold that when the
issue is presented at trial, a defendant bears the burden of proof, by a preponderance of the
evidence, to establish that he is mentally retarded. In evaluating the sufficiency of the
evidence to support a jury's determination that a defendant is not mentally retarded, we
must consider all of the evidence relevant to the issue and evaluate whether "the judgment
is so against the great weight and preponderance of the evidence so as to be manifestly
unjust." See Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990)(conducting a
factual-sufficiency review of affirmative defense of insanity); see also Bigby v. State, 892
S.W.2d 864, 875 (Tex. Crim. App. 1994)(also conducting factual-sufficiency review of
insanity affirmative defense), and Watson v. State, 204 S.W.3d 404, 437 (Tex. Crim. App.
2006)(Cochran, J., concurring)(stating we should continue to follow the Meraz/Bigby
standard of review when the proponent bears the burden of proof by a preponderance of the
evidence). 

 The expert witness for the defense was Dr. Richard Garnett, a psychologist in private
practice with thirty-five years of experience in the field of mental retardation. (7) Garnett did
not administer any IQ or adaptive behavior tests to appellant, but he interviewed him
personally at the Harris County Jail in 2002. During the interview, appellant was "very
talkative" and "interactive," but "at times [Garnett] couldn't quite follow what he was
saying." In addition to interviewing appellant, Garnett also reviewed his school records, his
criminal-justice records, the transcript of an interview with his mother, and the results of
the 2002 psychiatric evaluation of appellant conducted by the State's expert. 

 Appellant attended school in the Palo Verde Unified School District in California
from 1980 to 1993. Garnett testified that appellant's school records consistently showed a
lack of achievement and a pattern of performing well below his grade level. When appellant
took the "Iowa Test of Basic Skills" in 1984, at age eight, his overall score was in the "low
five percentile," although his vocabulary score was "considerably higher." At age nine, his
scores "were still at pretty low levels," including many scores in the first and second
percentile, which "reflected that there had been very little learning over the year." At age
twelve, "he had peaks and valleys that ranged from the first percentile to the 22nd percentile,
but 11 of those 15 subscales were still at or below the six percentile." Appellant was
moved into "special resource" or "special education" classes when he was "around 13." He
was later placed into a program called "Second Chance," which was "an alternative to
juvenile detention."

 At age 14, appellant achieved a full-scale IQ score of 74 on the Wechsler
Intelligence Scale for Children-Revised exam (WISC-R). (8) Garnett testified that the
"standard error of measurement" for Wechsler test is "five points above and below" and that
"95 times out of a hundred the score is going to be in that range." (9) Appellant obtained a
full-scale score of 71 on an "Adolescent Behavior Inventory," which measured his adaptive
behavior, and Garnett testified that this score "would fall in the same kind of range as the IQ
would be." Appellant received a standard score of 60 and a cognitive development score of
61 on the "Personality Inventory for Children," and Garnett testified that these scores are
"not the same as the IQ scores." 

 In 1991, when appellant was in the eleventh grade, he was reading at the fifth- grade
level, "math was 3.9," and "spelling was 5.4." In 1992, at age seventeen, all of his basic
skills test scores "were at or below the 5th grade level of achievement." His 1992 scores
on the "Wide Range Achievement Test" and the "Woodcock Johnson" test showed that he
was at or below the sixth-grade level in spelling, math, and reading. His school records
stated at that time that he was still eligible for special education. Appellant stopped
attending school in 1993. 

 Garnett testified that appellant had an IQ score that was two standard deviations
below average, limitations in at least two areas of adaptive behavior, and evident signs of
mental retardation before the age of eighteen. Thus, he concluded that appellant was
mentally retarded.

 Defense witness Melinda Bates testified at punishment that she was appellant's
teacher when he was in the tenth grade. She taught him in a "resource class" for children
with "learning disabilities" or "cognitive problems." Appellant read at a third-grade level in
tenth grade. He had "cognitive delays" and "struggled with school" despite the fact that
resource classes "were adapted specifically for students who have low skills." Although
appellant was suspended and later expelled for misconduct in school, he was polite,
respectful, and obedient in her class. Bates explained that the school system used the term
"limited cognitive functioning" instead of "mentally retarded." She further explained that
students in resource classes were graded on the basis of their effort and motivation, which
was "totally different" than in a mainstream class.

 Defense witness Charlene Gallo, appellant's mother, testified at punishment about
appellant's behavior as a child. She had to constantly repeat things to him before he would
understand them. He often looked at her "in a blank way" and pretended to understand her. 
He could not perform simple tasks like taking out the trash, gluing wings on a model
airplane, following a grocery list, making change, using a map or globe, reading a clock with
numbers, or fixing things around the house. He did not learn the alphabet until he was in
fifth or sixth grade and had trouble tying his shoes. It was difficult for him to navigate his
neighborhood, and he used landmarks instead of street signs to get around. He had to take
his driver's test orally because he could not read it. 

 On cross-examination, Gallo acknowledged that she consistently described appellant
as "above average" when she was interviewed by school and juvenile authorities in the past. 
She also described appellant as a "leader" when he was in Little League. She testified that
he had friends and that he started going to school and doing more chores around the house
after he was first arrested as a teenager. She further testified that appellant worked in fast
food restaurants as a teenager and that as an adult he was able to find work and live on his
own. 

 The State's expert witness was Dr. George Carl Denkowski, a clinical psychologist
who reviewed appellant's records, interviewed four of his former high-school teachers and
his former probation officer, and personally evaluated him. (10) Appellant obtained a full-scale IQ score of 68 when Denkowski tested him at age 27 in 2002. Denkowski also tested
appellant's depression and anxiety levels using the "Beck Depression Inventory" and the
"Beck Anxiety Inventory." Appellant's scores indicated that he was "seriously depressed
and moderately anxious." Denkowski testified that people who are seriously depressed
"tend to produce IQ scores that are about eight points lower." He testified that appellant's
"lack of achievement, motivation, [and] his disinclination to apply himself in school would
have contributed somewhat to lowering his IQ score." He believed that appellant's IQ was
above 70, after taking into account his previous IQ score and the evidence of his depression
and anxiety.

 Denkowski testified that appellant had a lack of motivation rather than a lack of
ability. Appellant's scores on the "Iowa Test of Basic Skills" during his school years
showed that "he has adequate learning ability when he's motivated to apply it." Denkowski
also pointed out that appellant's grades and achievement scores tended to increase after he
got into trouble as a juvenile and after his mother placed him into foster care.

 Denkowski testified that when appellant's mother previously answered questions
about him on the "Personality Inventory for Children," she rated him above average in
general achievement, development, social skills, general adjustment, cognitive
development, and intelligence. Denkowski acknowledged that parents sometimes overstate
the skills of their children, however, "the rating was so high on these skills . . . that even
when you discounted for that tendency it showed that in her mind he functioned just as well
as any other child." She also reported that appellant had depression, anxiety, and an
"extremely high" level of delinquency in high school. Denkowski adjusted appellant's
"Adolescent Behavior Inventory" score to 85 because the test had "bad norms" and
"compared [appellant] to kids that were much older than he was." 

 Appellant told Denkowski that he had worked for "Hydroblast" in Houston, using
high-pressure hoses to wash the inside of reactor tanks. He worked on scaffolds in
confined spaces, wore a respirator, and "had to learn how to get extra oxygen in case
something blew up." He was required to pass tests on safety procedures and the proper use
of high pressure equipment. If he did not pass a test the first time, then he used a "problem
solving strategy" and "would remember pictures and words and numbers so that when he
retook the test he would pass it." Denkowski testified that mentally retarded people in
general are "highly deficient in that sort of strategy." 

 Denkowski also tested appellant's adaptive behavior in 2002. Denkowski's "2002 

Adaptive Behavior Assessment System Data," which is contained in State's Exhibit 145,
states that appellant had an "adaptive composite" scaled score of 71 and a "scaled score
range" of 69 to 77. Denkowski testified that appellant had "a high level of adaptive behavior
in the environment he lived in," as evidenced by his "chronic drug selling," "ability to
mediate gang conflicts," and "ability to maintain employment." Denkowski testified that
appellant was deficient in "functional academics," but explained that "[k]ids that have initial
behavior problems in initial grades fall behind and never catch up." (11) Denkowski also found
that appellant was deficient in "health and safety," but reasoned that most people with a
delinquent background "don't worry too much about health and safety" and do not learn
those skills because "it's just unimportant to them." Denkowski concluded that appellant
was not mentally retarded. 

 High school teacher James Smallwood testified that appellant was a student in his
culinary-skills class during his senior year. Appellant was in the "Restaurant Division,"
which served lunch to teachers. Appellant performed all of the jobs in the class, ranging
from dishwasher to short-order cook. Appellant "did not like the front of the house," or
"public area," but he excelled at being a short-order cook, which involved "a lot of timing"
and "thinking skills." Smallwood testified that appellant had good communication skills and
was good at dealing with and leading people. Smallwood also enlisted appellant's help in
his attempt to deal with gang problems and create a "safe zone" at the high school. 

 Susan Distal testified that she was appellant's juvenile-probation officer from 1991
to 1993. She had frequent contact with appellant and never suspected that he was mentally
retarded. She met with teachers and family members and there were never any discussions
about mental retardation. Appellant never appeared to have any problems understanding her
questions or following their conversations. Appellant seemed to lack motivation in school
at times. Distal testified, "He would bring in his report card and when he was willing and
ready to do the work and motivated to do it his grades would go up. When he wasn't they
would go down." Appellant was confined in a juvenile facility for about sixty-two days as
part of his probation. Officials at the facility never referred him to be evaluated for mental
retardation. 

 In summary, this case involves dueling experts and evidence both in favor of and
against a finding of mental retardation. Appellant's IQ score was above 70 prior to the age
of 18 and below 70 at the age of 27. Denkowski explained that appellant's lack of
motivation, serious depression, and moderate anxiety served to lower his score. In school,
appellant was in resource classes and had achievement scores that were below his grade
level. Denkowski theorized that appellant's poor academics were due to a lack of
motivation rather than a lack of ability. Appellant excelled as a short-order cook in his high
school culinary class, a multi-tasked job that required thinking and timing skills. One high
school teacher described him as a leader and a good communicator, while another testified
that he struggled in her resource class. The evidence also showed that appellant worked in
fast food restaurants, passed safety and procedure tests for his job at Hydroblast, had
friends and relationships with women, was involved in a gang, and sold drugs. The jury was
ultimately in the best position to make credibility determinations and evaluate this
conflicting evidence. Briseno, 135 S.W.3d at 9; Hall v. State, 160 S.W.3d 24, 40 (Tex.
Crim. App. 2004), cert. denied, 545 U.S. 1141 (2005). 

 The Briseno factors in this case lend further support to the jury's determination. 
Although appellant was in resource classes in school, his mother and his juvenile probation
officer did not think that he was mentally retarded during his developmental phase. His
mother and his high school culinary-class teacher both stated that he had leadership skills. 
Garnett and appellant's mother noted some communication problems, but the State's
witnesses all described appellant as a good communicator who had no trouble
understanding and answering their questions. Although appellant's commission of the
instant offense may have been impulsive, his subsequent conduct showed his ability to lie in
his own interest. After he killed the victim, he cleaned the blood and feces from her body
and changed her clothes. He called the victim's mother at work and said that the victim was
not breathing and he did not know what was wrong with her. He reminded the victim's
mother that he had a warrant out for his arrest for a parole violation and fled the scene
before police arrived. He said in his statement to police that he observed the victim "having
problems breathing" after he awoke from a nap, that she defecated on herself when he was
trying to resuscitate her, and that he cleaned her with toilet paper and put water on her head
and face to wake her. The victim's bloody nightgown was later found under the water heater
in the garage. While in the county jail awaiting trial, appellant admitted to a fellow inmate
that he beat the victim to death and "tried to clean her up," adding that "he failed the IQ test"
and "he'd probably beat the case because he was retarded."

 The evidence was sufficient to support the jury's determination that appellant failed
to prove mental retardation. The judgment was not so against the great weight and
preponderance of the evidence so as to be manifestly unjust. Meraz, 785 S.W.2d at 155. 
Point of error one is overruled.

 In point of error two, appellant claims that the trial court erred in denying his motion
for mistrial and his motion for continuance when Briseno "was handed down in the midst of
trial." He asserts that "[t]he defense needed time to study Briseno and also the effect it
would have on their presentation of evidence in the instant case." We review a trial court's
denials of motions for mistrial and continuance under an abuse of discretion standard. 
Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); Heiselbetz, 906 S.W.2d at 
511.

 This Court published the Briseno opinion on Wednesday, February 11, 2004. 
Defense counsel moved for a mistrial on Thursday, February 12, after both sides rested and
before closing arguments at the guilt phase. Defense counsel argued as follows:

 [The] A.A.M.R. had a definition that involved IQ score and adaptive
behavior functioning and onset before the age of 18. We geared our defense
for meeting that challenge. We obviously have raised the retardation debate,
but more importantly we intend to raise it at punishment with that rule in
place, with that goal in mind to try to meet the existing case law as we
understood it up until yesterday.


 And what the Court has done now, which we certainly, with all due
respect, you know, we'll challenge the underlying premise of Briseno, which
is that Texas may in some way subvert the Eighth Amendment protections of
Atkins by coming up with some sort of citizen-sponsored standard that you
have to meet to be in Texas retarded. And I think that just completely
subverts the whole idea of Atkins and ultimately, I hope, would result in a
finding that the Eight[h] Amendment would be violated by such a process.


 But in any event, with all due respect to the Court, we now have a new
way of trying these cases which we are surprised by and which will be to the
detriment of our client if we're forced to go forward.


 I told the Court in chambers that we're prepared to defend against the
definition we had of the adaptive behavior scales which had been argued back
and forth between the experts. We chose not to bring civilian witnesses to
banter back and forth on the [minutia] of the adaptive behavior when we had
what we thought was strong expert testimony.


 The Court now, in Judge Cochran's opinion stands that strategy on it's
[sic] head and says that's not going to get the job done. Had I known that
before yesterday, I would have done this: Prepared this case differently, and I
would be prepared to go forward with the emphasis on lay witnesses. As I
read Briseno, she concedes or argues that there's going to be experts, we
take that for granted, each side will employ someone to carry their argument
forward. But the real battle will come in the lay witness category and in our
opinion she elevates that lay witness battle over adaptive behavior, you know,
in violation of the Eighth Amendment. But in my opinion it doesn't count,
her's [sic] does, and I would have done things differently had I had access to
this before yesterday.


 So for all these reasons, Your Honor, we would respectfully move for
a mistrial.


The State responded that Briseno placed the burden of proof on the defense but did not
change the definition of mental retardation, and the trial court denied appellant's motion for
mistrial. Defense counsel then asked for additional time to "try to gauge our strategy and
address this with more emphasis on the lay witnesses and adaptive behavior," and the trial
court stated it would "reconsider the request in terms of punishment."

 Defense counsel filed a written motion for continuance on Tuesday, February 17,
after the State rested on punishment but before the presentation of appellant's punishment
evidence. Defense counsel argued that he had originally intended to rely only on expert-
witness testimony regarding adaptive behavior, but that Briseno "elevated the lay witnesses
on adaptive behavior far beyond what the law permitted before that time and made their
opinion the most crucial one in a determination of whether someone is retarded or not." 
The defense investigator traveled "back to California to reinvestigate the lay witnesses" on
"President's Day weekend," leaving on Friday, February 13, and returning on Monday,
February 16. Defense counsel explained that the investigator was "able to locate one
witness," that "[t]wo others that we were able to locate could not come back," and "a bunch
of people we wanted to talk to just weren't there because of the holiday." Defense counsel
stated in the written motion that more time was needed to subpoena "two lay witnesses,"
Lelo Solario and Jose Solario. Defense counsel explained that their testimony was
"crucial" because "[b]oth have stated that they have known Defendant since the
'developmental period' (before he was 18) and both have observed significant adaptive
deficits in Defendant's everyday life; both had and have, the opinion that he is mentally slow
and does not function on an ordinary level of intelligence and life skills." The trial court
ruled as follows:

I think, as it turned out, there was an extra day. I had planned on giving you an
extra day, but the Court was actually sick one day, so there was one extra day. 
I think you indicated you sent somebody to California to try to find some
people. Obviously that's not a lengthy continuance. You were actually given
a day to try to find some additional people, and so your request for
continuance will be deny [sic].


The Court later clarified that the "Motion for Continuance was granted for one day," but
that additional time was denied. (12)

 Appellant complained at trial that he was unable to properly present his mental-
retardation claim because Briseno changed the AAMR definition of mental retardation by
assigning "superior status" to "lay witness testimony" on adaptive behavior. This
characterization is inaccurate. In Briseno, we specifically stated that we will follow the
criteria set out by the AAMR and the Texas Health and Safety Code until the Texas
Legislature provides an alternate statutory definition of mental retardation applicable to
death penalty cases. 135 S.W.3d at 8. Recognizing that the adaptive-behavior criteria are
"exceedingly subjective," we set out some additional factors that factfinders might also
focus upon in weighing evidence as indicative of mental retardation. Id. Although these
factors incorporate lay-witness testimony, they do not exclude or downplay the importance
of expert testimony or other evidence. In fact, we stated that "experts may offer insightful
opinions on the question of whether a particular person meets the psychological diagnostic
criteria for mental retardation." Id. at 9. Further, many of the Briseno factors pertain to
the facts of the offense and the defendant's behavior before and after the commission of
the offense. The ultimate issue of whether a defendant is mentally retarded for purposes of
the Eighth Amendment ban on excessive punishment is one for the finder of fact, based
upon all of the evidence and determinations of credibility. Id. 

 Appellant has not shown that he was prejudiced by the trial court's rulings. See

Simpson, 119 S.W.3d at 272 (stating mistrial is appropriate for only "highly prejudicial and
incurable errors"); see also Heiselbetz, 906 S.W.2d at 511 (requiring defendant to show
specific prejudice to his defense to establish that there was an abuse of discretion in
denying a continuance). At punishment, appellant presented the adaptive behavior
testimony of witnesses who knew him best during the developmental phase, including his
mother and his tenth-grade resource teacher. Briseno, 135 S.W.3d at 8. Although he
mentioned two additional "lay witnesses," Lelo and Jose Solario, in his motion for
continuance, he fails to discuss them at all on appeal. The trial court did not abuse its
discretion in denying appellant's motion for mistrial or motion for continuance. The trial
court's rulings were within the zone of reasonable disagreement. Heiselbetz, 906 S.W.2d
at 517; Wead v. State, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). Point of error two is
overruled. 

 In point of error three, appellant argues that the trial court erroneously rejected his
proposed instructions regarding mental retardation. Appellant filed a motion entitled
"Defendant's Requested Charge - Mental Retardation" and requested that the mental
retardation special issue state as follows:

Tomas Gallo, the Defendant, has offered evidence that he is significantly
limited in his reasoning, social and practical skills. The Defendant contends
that this impairment began before the age of 18, and it includes significantly
sub-average intellectual functioning, and limitations in coping with the
generally recognized standards of personal independence and social
responsibility. If such an impairment is shown, it is called mental
retardation.


Has the State proven to you, beyond a reasonable doubt, that the Defendant
does not have such a mental impairment?


The trial court denied appellant's request. Appellant also filed a motion entitled
"Defendant's Alternative Requested Charges - Mental Retardation," and requested the
following definitions, in order of preference:

(a) Tomas Gallo, the Defendant, has offered evidence that he has a mental
impairment called mental retardation. A person with mental retardation is a
person with significantly sub-average general intellectual functioning. He is
limited in the effectiveness with which he can carry at least one of the
requirements of everyday life, e.g. communication, self-direction, self-care,
health and safety, social skills, community use, functional academics, home
living, leisure, and work. Mental retardation begins before the age of 18;


(b) Tomas Gallo, the Defendant, has offered evidence that he has a mental
impairment called mental retardation. A person with mental retardation is a
person with significantly sub-average general intellectual functioning. He is
limited in the effectiveness with which he can carry out two or more of the
requirements of everyday life, e.g. communication, self-direction, self-care,
health and safety, social skills, community use, functional academics, home
living, leisure, and work. Mental retardation begins before the age of 18;


(c) The jury is to decide if Tomas Gallo, the defendant, has raised an issue of
mental retardation. A person with mental retardation is a person with
significantly sub-average general intellectual functioning. He is limited in
the effectiveness with which he can carry out two or more of the
requirements of everyday life, e.g. communication, self-direction, self-care,
health and safety, social skills, community use, functional academics, home
living, leisure, and work. Mental retardation begins before the age of 18.


The trial court denied appellant's requested definitions and instead instructed the jury as
follows:

 With respect to the second Special Issue, you are instructed that
"mental retardation" means significantly sub-average general intellectual
functioning that is concurrent with deficits in adaptive behavior and
originates during the developmental period, onset prior to the age of 18.


 "Adaptive behavior" means the effectiveness with or degree to which a
person meets the standards of personal independence and social
responsibility expected of the person's age and cultural group.


 "Sub-average general intellectual functioning" refers to measured
intelligence on standardized psychometric instruments of two or more
standard deviations below the age group mean for the tests used.


 * * *


SPECIAL ISSUE NO. 2


 Do you find, taking into consideration all of the evidence, that the
Defendant is a person with mental retardation?


 Appellant contends that the trial court should have instructed the jury that the State
had the burden of proving that appellant was not mentally retarded, because Article 37.017,
§ 2(c), provides that the State must prove all of the punishment special issues beyond a
reasonable doubt. Appellant further complains that "[t]he instruction given is arcane and
almost incomprehensible." We specifically stated in Briseno that the defendant bears the
burden of proof, by a preponderance of the evidence, to establish that he is mentally
retarded. 135 S.W.3d at 12. The trial court's instructions contain the exact definitions of
"mental retardation," "adaptive behavior," and "subaverage general intellectual functioning"
from section 591.003 of the Texas Health and Safety Code, with the additional phrase
"onset prior to the age of 18" from the AAMR definition. In Briseno, we endorsed the use
of the AAMR and Texas Health and Safety Code definitions until the Texas Legislature
provides an alternate statutory definition of "mental retardation" for use in capital
sentencing. Id. at 7-8. The trial court did not err in refusing appellant's instructions. Point
of error three is overruled.

IMPACT OF EXECUTION

 In point of error nine, appellant argues that the trial court erroneously excluded
evidence of the impact his execution would have on his family and friends, in violation of
his Eighth Amendment right to present mitigating evidence. We have previously rejected
this argument. Holberg v. State, 38 S.W.3d 137, 141 (Tex. Crim. App. 2000);
McFarland, 928 S.W.2d at 522; Fuller v. State, 827 S.W.2d 919, 935-36 (Tex. Crim. App.
1992). This type of evidence is objectionable because it does not pertain to appellant's
background, character, or record, or the circumstances of the offense. Fuller, 827 S.W.2d
at 935-36. Appellant cites Payne v. Tennessee, 501 U.S. 808 (1991), in support of his
argument, but this evidence does not fall within the scope of Payne. Jackson v. Dretke,
450 F.3d 614, 618 (5th Cir. 2006), cert. denied, 127 S. Ct. 935 (2007). Point of error nine
is overruled.

RESIDUAL DOUBT INSTRUCTION

 In his tenth point of error, appellant asserts that the trial court "erred in denying [his]
request for an instruction allowing the jurors to consider any residual doubt as a mitigating
circumstance when answering the mitigation special issue and the continuing threat special
issue." He alleges that he was deprived of "his right to lace all mitigating evidence,
including the 'circumstances of the offense' within the jury's effective reach," in violation
of the Eighth and Fourteenth Amendments to the United States Constitution. There is no constitutional right to have jurors' residual doubts about the defendant's
guilt be considered as a mitigating factor during deliberations in a capital murder case. 
Franklin v. Lynaugh, 487 U.S. 164, 174 (1988); Blue v. State, 125 S.W.3d 491, 502 (Tex.
Crim. App. 2003). Further, there is no constitutional right to a jury instruction regarding
residual doubt. Franklin, 487 U.S. at 174-175. Point of error ten is overruled.

CLOSING ARGUMENT ON MITIGATION

 In point of error eleven, appellant argues that the trial court erroneously refused his
request to give the final closing argument on the mitigation special issue, in violation of the
Eighth and Fourteenth Amendments to the United States Constitution. He asserts that
Article 36.07 does not govern procedure in capital cases, that the trial court has discretion
to change the order of arguments in a capital case, that the burden of proof determines who
has the right to closing argument, that the State has no burden of proof on the mitigation
issue, and that the State "had the psychological advantage of responding to defense
arguments on punishment and making the last impression on the jurors." We specifically
rejected each of these arguments in Masterson v. State, 155 S.W.3d 167, 174-175 (Tex.
Crim. App. 2005), cert. denied, 546 U.S. 1169 (2006). Point of error eleven is overruled.

DEATH PENALTY PROCEDURE

 In point of error twelve, appellant argues that the trial court erred in denying his
"motion to preclude the death penalty as a sentencing option or, in [the] alternative quash
the indictment," based on Apprendi v. New Jersey, 530 U.S. 466 (2000), and Bush v.
Gore, 531 U.S. 98 (2000). Appellant argues that the future-dangerousness special issue
should have been pled in the indictment because Apprendi requires that any fact other than
a prior conviction that increases the maximum punishment for a crime must be alleged in
the indictment and proven to a jury beyond a reasonable doubt. Citing Bush v. Gore, he
argues that the death-penalty system is "arbitrary and capricious" because prosecutors have
unfettered discretion to seek the death penalty and there are no uniform statewide standards
to guide them in that decision. Appellant acknowledges that we have previously rejected
these arguments. Rayford v. State, 125 S.W.3d 521, 533-534 (Tex. Crim. App. 2003);
Threadgill v. State, 146 S.W.3d 654, 671-672 (Tex. Crim. App. 2004). We decline to
revisit these issues here. Point of error twelve is overruled.

EXECUTION PROTOCOL

 In point of error thirteen, appellant contends that the trial court erroneously denied 

his pretrial motion to preclude the death penalty in violation of the Eighth and Fourteenth
Amendments to the United States Constitution. In appellant's motion, he specifically
challenged the use of pancuronium bromide in the lethal-injection procedure. Appellant's
execution is not imminent. The method in which the lethal injection is currently
administered is not determinative of the way it will be administered at the moment of
appellant's execution. Doyle v. State, No. AP-74,960, 2006 Tex. Crim. App. LEXIS 925,
at *11 (Tex. Crim. App. May 10, 2006). Thus, his claim is not ripe for review. Id. Point of
error thirteen is overruled. 

 We affirm the judgment of the trial court.

 Meyers, J.



Delivered: September 26, 2007

Publish
1. Appellant was initially indicted and tried for the offense in 2002; however, a mistrial was
granted on January 2, 2003, because of a disabled juror. Appellant was re-indicted on February 20,
2003. 
2. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal
Procedure.
3. The order on appellant's motion for continuance in the clerk's record says that it was
granted. However, this is not otherwise reflected in the record, and appellant did not receive a
continuance.
4. "Soft" sciences include the social sciences or fields that are based primarily upon experience
and training as opposed to the scientific method. Nenno, 970 S.W.2d at 561.
5. Miranda v. Arizona, 384 U.S. 436 (1966).
6. Although appellant's first point of error is multifarious, we will review his arguments in the
interest of justice.
7. Garnett testified at the guilt phase of the trial. At punishment, defense counsel stated he
"would reoffer the evidence [he] offered during the guilt phase."
8. The phonetic spelling of "Wechsler" is used in the statement of facts. Garnett testified that
"[t]hey administered the Wexler Intelligence Scale for Children, the revised edition" and that the State's
expert, Dr. George Carl Denkowski, "did a complete Wexler evaluation." We will assume this means
that appellant took the WISC-R at age 14 and that Denkowski administered a version of the Wechsler
Adult Intelligence Scale (WAIS) at age 27. 
9. The American Psychiatric Association definition of mental retardation quoted in Atkins states
that "mild" mental retardation is typically used to describe people with an IQ level of 50-55 to
approximately 70.


 
10. The State's witnesses who testified regarding mental retardation did so at the guilt phase
(except for Susan Distal, who testified at both phases of trial). At punishment, the State "reoffer[ed] all
the evidence from the case in chief."
11. Under the American Association of Mental Retardation (AAMR) definition quoted in
Atkins, "adaptive skill areas" include the following: communication; self-care; home living; social skills;
community use; self-direction; health and safety; functional academics; leisure; and, work. 536 U.S. at
308 n.3. 
12. The trial court's order on appellant's motion for continuance shows that it was denied, but
also notes: "ct. did give one day (Friday 2-13-04)."